In re TELESPHERE COMMUNICATIONS, INC., et al., Debtors.

ALMAR COMMUNICATIONS, LTD., et al., Plaintiffs,

v.

TELESPHERE COMMUNICATIONS, INC., et al., Defendants.

The CHASE MANHATTAN BANK, et al., Cross Plaintiffs, Counter Plaintiffs, and Third–Party Plaintiffs,

v.

ALMAR COMMUNICATIONS, LTD., et al., Third–Party Defendants.

Bankruptcy Nos. 91 B 17581, 91 B 19188 and 91 B 19189. Adv. No. 91 A 1136.

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

April 1, 1994.

Marcia L. Goldstein, Sean L. McKenna, Weil, Gotshal & Manges, New York City, John Collen, Douglas B. Rosner, Sonnen-

schein, Nath & Rosenthal, Chicago, IL, for Chase Manhattan Bank.

Andrew T. Fruend, Zukowski, Rogers, Flood & McArdle, Crystal Lake, IL, for Vocall Communications Corp.

Walter J. Cicack, Meyer, Orlando & Evans, Houston, TX, for Capital Savings Corp.

Kevin M. Brill, Kevin M. Brill & Assoc., Chtd., M. Marshall Seeder, Marc Kieselstein, Sachnoff & Weaver, Ltd., Chicago, IL, Jeffrey M. Steinberg, Livingston, NJ, Lawrence F. Flick, II, Blank, Rome, Comisky & McCauley, Philadelphia, PA, for Almar.

Robert Fishman, Patrick S. Munzer, Ross & Hardies, Chicago, IL, for debtors.

## MEMORANDUM OF OPINION

EUGENE R. WEDOFF, Bankruptcy Judge.

This adversary proceeding arises in the context of three administratively consolidated Chapter 11 cases; it presents a question of the ownership of money. The debtors were, among other things, middlemen in the 900 number telephone business. They arranged for telephone programs created by "information providers" to be transmitted to local telephone companies, whose customers could then call 900 numbers in order to listen to the programs. The debtors also received payments for the 900 number calls from the local telephone companies, and made payments to the information providers. At the time that orders for relief were entered in

these cases, the debtors had not paid the information providers all of the money to which they were entitled. Thereafter, certain information providers brought this adversary proceeding, claiming ownership of the money paid by the local telephone companies to the debtors in connection with 900 number programs. The adversary plaintiffs contend that the debtors held this money merely as agents of the information providers, with no ownership interest. The debtors, in turn, supported by their secured lenders, contend that they obtained both legal and equitable title to the money received from the local telephone companies, and that the information providers are simply unsecured creditors of the debtors' estates. The issue is before the court on cross motions for summary judgment. For the reasons set forth below, the court finds that both legal and equitable title to the 900 number proceeds are held by the estates of the debtors, and grants judgment accordingly.

### Jurisdiction

This Court has jurisdiction to hear this adversary proceeding pursuant to 28 U.S.C. § 1334(a), (b), and (d); 28 U.S.C. § 157(a), (b)(1), and (b)(2); and General Rule 2.33 of the United States District Court for the Northern District of Illinois. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A).[1]

### Findings of Fact

The relevant facts are undisputed and are drawn from the exhibits and statements of undisputed facts submitted by the parties.[2]

---

1. The action is one that would have been within the summary jurisdiction of a bankruptcy court under the Bankruptcy Act of 1898, since it seeks to determine the ownership of property in the actual possession of the debtors. *Katchen v. Landy*, 382 U.S. 323, 326–27, 86 S.Ct. 467, 470–71, 15 L.Ed.2d 391 (1966); *Thompson v. Magnolia Petroleum Co.*, 309 U.S. 478, 481, 60 S.Ct. 628, 629–30, 84 L.Ed. 876 (1940); *Whitney v. Wenman*, 198 U.S. 539, 552, 25 S.Ct. 778, 781, 49 L.Ed. 1157 (1905).

2. The pertinent exhibits and statements of undisputed facts include:
1. [IPs'] Statement Of Material Facts As To Which There Is No Genuine Issue For Purposes Of Summary Judgment (hereinafter, "IPS");
2. Certain Information Providers' 12(n) Statement In Response To Statement Of Uncontested

Facts In Support Of Motion For Summary Judgment On Behalf Of The Chase Manhattan Bank (National Association), Citibank, N.A., And Bell Atlantic Tricon Leasing Corporation (hereinafter, "IPRS");
3. Statement Of Uncontested Facts In Support Of Motion For Summary Judgment On Behalf Of The Chase Manhattan Bank (National Association), Citibank, N.A., And Bell Atlantic Tricon Leasing Corporation (hereinafter, "TS");
4. Response Of The Chase Manhattan Bank (National Association), Citibank, N.A., And Bell Atlantic Tricon Leasing Corporation To Certain Information Providers' Statement Of Material Facts As To Which There Is No Genuine Issue For Purposes Of Summary Judgment, And Facts Alleged In Plaintiffs' Motion for Summary Judgment (Brill IPs) (hereinafter, "TRS");

In August, 1991, an involuntary bankruptcy proceeding was commenced under Chapter 7 of the Bankruptcy Code (Title 11, U.S.C., "the Code") against Telesphere Communications, Inc. In September, 1991, Telesphere Communications, Inc. converted the involuntary Chapter 7 case to a voluntary case under Chapter 11 of the Code, and its two subsidiaries, Telesphere Network, Inc. and Telesphere Limited, Inc., each filed a voluntary petition for relief under Chapter 11 of the Code. Shortly thereafter, this court entered an order administratively consolidating the three Chapter 11 cases. In November, 1991, plaintiffs instituted this adversary proceeding against the three debtors (collectively referred to as "Telesphere").

*General background.* This case involves the 900 number telephone business. (*Compare* IPS ¶¶ 3–4 & 15–18 *with* TRS ¶¶ 3–4 & 15–18.) "900 number" refers to the dialing prefix used in making the telephone calls involved in this business. (*Compare* IPS ¶ 6 *with* TRS ¶ 6.) By placing telephone calls to 900 numbers, customers of local telephone companies can receive information and entertainment programs created by "information providers"—or "IPs"—and pay for these programs through a per call charge on their regular telephone bills. (IPRS ¶¶ 24–25, 29–30 & 33–34; *compare* IPS ¶¶ 6–11 & 16 *with* TRS ¶¶ 6–11 & 16.)

The plaintiffs in the pending proceeding are information providers. (*Compare* IPS ¶ 4 *with* TRS ¶ 4.) They developed, promoted, and set prices for telephone programs which they intended to distribute to the public through the use of 900 numbers. (IPRS ¶ 25; *compare* IPS ¶¶ 4 & 30 *with* TRS ¶¶ 4 & 30.) In order to make their programs available nationwide, the IPs needed access to telecommunication networks in addition to the one provided by the telephone company which supplied services for the region in which they were located. (IPRS ¶ 29; *see also* IPS May Exhibits, Group Exhibit B (Letter of Agency Affidavits), ¶¶ 2–3.) They could obtain such access through "interexchange carriers." (IPRS ¶ 29; *see also* IPS May Exhibits, Group Exhibit B (Letter of Agency Affidavits), ¶¶ 2–4.)

Telesphere was an interexchange carrier. (*Compare* IPS ¶¶ 3 & 7 *with* TRS ¶¶ 3 & 7.) It served as an intermediary between IPs and local telephone companies in two respects. First, it supplied the switching and transmission services—known as "access services"—which linked the IPs with the telecommunications networks of local telephone companies located throughout the United States. (*See* IPRS ¶ 29; *see also* IPS May Exhibits, Group Exhibit B (Letter of Agency Affidavits), ¶¶ 2–4; *compare* IPS ¶¶ 7 & 16 *with* TRS ¶¶ 7 & 16.) This link allowed the customers of local telephone companies throughout the country to receive the IPs' programs by dialing the appropriate 900 number. (IPRS ¶ 29; *compare* IPS ¶¶ 3, 7 & 16 *with TRS* ¶¶ 3, 7 & 16.) Second, it arranged for "billing and collection" services, receiving payment from local telephone companies—based on the 900 number calls made by their customers—and, in turn, making payments to the IPs based on these calls. (IPRS ¶ 30; *compare* IPS ¶¶ 6–11 & 16 *with* TRS ¶¶ 6–11 & 16.) In one promotional brochure directed to IPs, Telesphere described this aspect of its services by stating that it would "handle all the billing ... from collecting fees to sending your revenues" (ellipsis in original). (*See* IPRS ¶ 30; *see also* T April Exhibits, Appendix A, Tab 36, Page ACH 35477.)

*Documentation of the business relationship.* There are only a few documents that defined the relationship between Telesphere and the IPs. In connection with providing access services, Telesphere regularly submitted to the IPs a "Letter of Agency." (*See* IPRS ¶¶ 102 & 106 [sic: ¶¶ 103 & 106]; *see also* IPS May Exhibits, Group Exhibit B (Letter of Agency Affidavits); *compare* IPS ¶ 20 *with* TRS ¶ 20.) That letter, which

5. [IPs'] Index to Appendix of Transcript Excerpts and Exhibits filed on April 26, 1993 (hereinafter, "IPS April Exhibits");
6. [IPs'] Index to Appendix of Exhibits filed on May 17, 1993 (hereinafter, "IPS May Exhibits"); and

7. [Telesphere's] Exhibits filed on April 26, 1993 by Counsel for the Chase Manhattan Bank (National Association), Citibank, N.A., and Bell Atlantic Tricon Leasing Corporation (hereinafter, "T April Exhibits").

called for execution by the IP, read, in pertinent part, as follows:

Effective immediately, [*IP name*] has appointed Telesphere, with offices at Two Mid America Plaza, Suite 500, Oak Brook Terrace, IL 60181, as our authorized agent for matters pertaining to our telephone systems and services provided by your company.

The scope of this agency shall include, but not be limited to, the ordering or rearrangement of services, assignment of primary interexchange carrier, service requests, disconnection of service and requests as indicated below. This authorization is not exclusive and shall not supersede our own authority or that of any other authorized agents which have been named in the past and whose agency authorization have [sic] neither expired nor been rescinded.

(IPRS ¶ 102 [sic: ¶ 103]; *see also* IPS April Exhibits, Group Exhibit E (Letters of Agency).)

Telesphere's billing and collection practices were announced to the IPs in a series of "revenue policies" that were periodically issued, and unilaterally revised, by Telesphere. (*Compare* IPS ¶ 33 *with* TRS ¶ 33; *see also* IPS April Exhibits, Exhibits F–I (Revenue Policy).) The Revenue Policy revised July 1, 1990 is typical of the series. (*Compare* IPS April Exhibits, Exhibit I (Revenue Policy) *with* IPS April Exhibits, Exhibits F–H (Revenue Policy).) This policy provided in pertinent part:

(1) that Telesphere would remit the "net proceeds of 900 billings to the Information Provider on a calendar month basis sixty days after the close of the month";

(2) that Telesphere would provide two sets of reports to each IP: *first*, 30–day reports setting forth the amounts that Telesphere submitted for billing in the preceding month to the local telephone companies for calls made to the IP's numbers, together with the service charges assessed by Telesphere; and *second*, 60–day reports, accompanying payment to the IP, again setting forth total billing and service charges, but also reporting an "Uncollectible Account Summary";

(3) that Telesphere would initially estimate the percentage of customer billings that would not be collected by the telephone companies according to a sliding scale, based on the average revenue per call; and

(4) that Telesphere would adjust the uncollectible rate "to the actual rate of uncollectibles as information is received from the various telephone companies." (IPS April Exhibits, Exhibit I (Revenue Policy).)

The Revenue Policies also made certain additional disclosures to the IPs. Those disclosures included Telesphere's express reservation of the right to adjust the "Uncollectible Rate" (or "Uncollectible Factor") and its right to enter into contracts "with the various serving telephone companies, independent billing companies and outside collection agencies, when permitted, to actively pursue collections on an independent basis." (See IPS April Exhibits, Exhibits F–I (Revenue Policy); *see also* IPRS ¶ 52.)

*Business practices.* Telesphere's dealings with the local telephone companies closely followed the revenue policies issued to the IPs. (*See generally* IPS April Exhibits, Exhibits O & P (Schwartz Affidavit & Overstreet Affidavit).) Telesphere recorded at its switch sites information relating to each 900 number call received from a customer of the local telephone companies. (IPRS ¶¶ 30 & 35; *compare* IPS ¶ 8 *with* TRS ¶ 8.) Telesphere then prepared computer tapes containing the information necessary for local telephone companies to bill to their customers for the 900 number charges, and periodically sent these tapes to the local telephone companies. (IPRS ¶¶ 30, 35 & 37; *compare* IPS ¶ 9 *with* TRS ¶ 9.) The local telephone companies reviewed the information received from Telesphere and made certain billing adjustments, which were set forth in their billing and collection agreements with Telesphere. (IPRS ¶¶ 30, 34, 41 & 44–45.) Those adjustments included, among other things, deductions both for prior charges determined to be uncollectible ("actual uncollectibles") and for the funding of a reserve for current charges estimated to be uncollectible ("estimated uncollectibles"). (IPRS ¶¶ 34 & 44; *compare* IPS ¶ 13 *with* TRS ¶ 13.) The adjustments also reconciled the

actual uncollectibles in each prior month to the estimated uncollectibles for that month. (IPRS ¶¶ 34 & 45.) After making the billing adjustments, the local telephone companies sent purchase acceptance reports to Telesphere. (IPRS ¶¶ 34 & 41–42.) Those reports reflected the adjusted balances which the local telephone companies agreed to pay for the 900 number charges reflected on the computer tapes. (IPRS ¶¶ 34 & 41.) Shortly after sending the purchase acceptance reports, the local telephone companies sent to Telesphere payments in the amount of the adjusted balances. (IPRS ¶¶ 34, 41–42 & 65.) Those payments did not differentiate, and the local telephone companies were not required to segregate, the payment amounts according to amounts owed to individual IPs. (IPRS ¶¶ 34 & 71–72; *compare* IPS ¶ 12 *with* TRS ¶ 12.)

The local telephone companies billed their customers for the 900 number charges by listing the charges as part of the monthly telephone bills sent to their customers. (*See* IPRS ¶¶ 39 & 42; *compare* IPS ¶¶ 9–11 *with* TRS ¶¶ 9–11.) The customers, in turn, paid to their local telephone company in whole or in part the amounts reflected on their telephone bills. (*Compare* IPS ¶¶ 9–11 *with* TRS ¶¶ 9–11; *see* IPRS ¶¶ 44–45 & 49.) However, the payments made by the local telephone companies to Telesphere were not transmittals of actual funds received from customers, but rather payments from the telephone companies' general funds, based on estimates of what the actual 900 number collections would be. (*Compare* IPS ¶¶ 12–13 *with* TRS ¶¶ 12–13; *see* IPRS ¶¶ 34, 42–45 & 71–72.)

Under the terms of its various revenue policies, Telesphere was under no obligation to establish trust accounts for amounts owed to individual IPs, or to segregate the funds received from the telephone companies on account of 900 number collections. (IPS April Exhibits, Exhibits F–I (Revenue Policy); *compare* IPS ¶ 33 *with* TRS ¶ 33.) In fact, Telesphere did not deposit payments received from the local telephone companies into trust or segregated accounts. (*See* IPS April Exhibits, Exhibits O & P (Schwartz Affidavit & Overstreet Affidavit).) Nor did it create any trust or segregated accounts for the purpose of making payments to IPs; rather, Telesphere made such payments primarily from its general operating funds held in a single disbursement account. (*See* IPRS ¶¶ 66–67; *see also* IPS April Exhibits, Exhibit O (Schwartz Affidavit), ¶ 6 [sic: ¶ 7]; IPS April Exhibits, Exhibit P (Overstreet Affidavit), ¶ 6.)

*The pending litigation.* When the orders for relief were entered in these cases, Telesphere had not paid the IPs all of the money which they were due under the revenue policies. The present proceeding is being pursued by certain IPs, seeking a judgment that they are entitled to all funds received by Telesphere from local telephone companies on account of 900 number calls made for the IPs' programs (the "900 number proceeds"). Telesphere has opposed the plaintiff IPs, and its secured creditors have filed a cross complaint against all of the IPs. The case is now before the court on cross motions for summary judgment.

## Conclusions of Law

*Summary judgment standards.* The Federal Rules of Bankruptcy Procedure provide for the granting of summary judgment whenever "[t]here is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Bankr.P. 7056 (incorporating Fed.R.Civ.P. 56); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Farries v. Stanadyne/Chicago Div.*, 832 F.2d 374, 378 (7th Cir.1987). A fact is "material" if the governing substantive law identifies the fact as one which might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute about a material fact is "genuine" only if the evidence in the record, taken as a whole, is such that a reasonable finder of fact could find in favor of the nonmoving party on that issue of material fact. *Anderson*, 477 U.S. at 248–49, 106 S.Ct. at 2510; *Farries*, 832 F.2d at 378; *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 659 (7th Cir.), *cert. denied*, 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987). In making this determination, the court cannot

weigh evidence. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11; *Valley Liquors,* 822 F.2d at 659. Instead, it must see if there is sufficient evidence favoring the nonmoving party for a reasonable finder of fact to find in favor of that party on the issue of material fact. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11; *Valley Liquors,* 822 F.2d at 659. In assessing the sufficiency of the evidence, the court must consider the applicable substantive standard of proof, for example, clear and convincing evidence, that would apply to the issue of material fact at a trial on the merits. *Anderson,* 477 U.S. at 252–56, 106 S.Ct. at 2512–14; *Valley Liquors,* 822 F.2d at 659. It also must draw every reasonable, but not conceivable, inference in the light most favorable to the nonmoving party. *Davis v. City of Chicago,* 841 F.2d 186, 189 (7th Cir. 1988); *Valley Liquors,* 822 F.2d at 659; *DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir.1987). Ultimately, the moving party bears the burden of showing the absence of any genuine issue of material fact. *Celotex,* 477 U.S. at 324–25, 106 S.Ct. at 2553–54; *Farries,* 832 F.2d at 378; *Cedillo v. International Association of Bridge & Structural Ironworkers,* 603 F.2d 7, 10 (7th Cir.1979).

■ The court has reviewed the exhibits and statements of undisputed facts submitted by the parties in connection with their respective summary judgment motions and finds that no genuine issue exists as to any of the facts set forth above. Thus, the court must now determine whether these facts entitle either party to judgment as a matter of law. *See Donald v. Polk County,* 836 F.2d 376, 379 (7th Cir.1988); *DeValk Lincoln Mercury,* 811 F.2d at 329. A party is entitled to a judgment as a matter of law if, after viewing the entire record in the light most favorable to the nonmoving party, a reasonable finder of fact could only render a judg-

ment against the nonmoving party. *See McEwen v. Delta AirLines, Inc.,* 919 F.2d 58, 60 (7th Cir.1990); *Hayes v. Otis Elevator Co.,* 946 F.2d 1272, 1277 (7th Cir.1991); *Doe v. Allied Signal, Inc.,* 925 F.2d 1007, 1008 (7th Cir.1991).

*The positions of the parties and the governing law.* The position of the IPs in this proceeding is grounded in the law of agency. The IPs argue (1) that the 900 number programs were owned by the IPs who created them, (2) that the IPs retained the services of Telesphere as an agent to transmit the programs to customers of local telephone companies, (3) that the payments made by the customers of the local telephone companies for listening to the programs accordingly belonged to the IPs, (4) that when Telesphere received payments from the local telephone companies on account of 900 number transmissions, Telesphere held the payments as agent for the IPs, and (5) that Telesphere thus had no title to the money involved in the 900 number proceeds. Telesphere and its secured lenders characterize the relationship between Telesphere and the IPs quite differently: they contend that Telesphere had a contractual duty to pay certain amounts to the IPs based on the transmission of their 900 number programs, but that this duty did not involve the conveyance of payments made by telephone customers. Thus, Telesphere argues, it did not receive 900 number proceeds as agent for the IPs, but owned this money as part of its own assets.

■ State law governs this dispute. Section 541(a)(1) of the Bankruptcy Code provides that a debtor's estate includes "all legal or equitable interest of the debtor in property as of the commencement of the case," but applicable nonbankruptcy law (generally state law) determines the nature and extent of the debtor's property interests.[3] Similar-

---

**3.** It has long been recognized that "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law" and that "state laws are … suspended only to the extent of actual conflict with the [bankruptcy] system." *Butner v. United States,* 440 U.S. 48, 54–55, 99 S.Ct. 914, 917–18, 59 L.Ed.2d 136 (1979) (applying the Bankruptcy Act of 1898); *UNR Industries, Inc. v. Continental Casu-*

*alty Co.,* 942 F.2d 1101, 1103 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1586, 118 L.Ed.2d 305 (1992) ("State law controls the determination of assets in a bankrupt estate, unless federal interests require a different result."); *In re Jones,* 768 F.2d 923, 927 (7th Cir.1985) ("Whether the debtor has an interest in property, and if he does, the nature of the interest, is not defined in the [Bankruptcy Code], and requires

ly, Section 541(d) provides that if a debtor holds only legal title in particular property, and not an equitable interest, that property becomes part of the estate "only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold." Again, however, whether a debtor's legal title is subject to an equitable interest on behalf of another is a question of applicable nonbankruptcy law. For purposes of this case, the applicable nonbankruptcy law is the substantive law of Illinois.[4]

■ Two aspects of Illinois law are particularly relevant to the question of the ownership of the money in dispute here. *First,* Illinois recognizes the general common law presumption that the party in possession of personal property, including money, holds title to that property. *Martin v. Martin,* 174 Ill. 371, 372, 51 N.E. 691, 692 (1898) (applying the presumption to negotiable instruments):

> The law will not require one in possession of a chattel or security, negotiable or otherwise, under claim of ownership, to deliver the same over upon the mere adverse claim of another, but will only disturb such possession upon proof of the right of such adverse claimant; that is to say, the presumption of the law is that one so in possession is prima facie entitled to remain in possession until the contrary is made to appear by proof.

*Accord People v. Poindexter,* 18 Ill.App.3d 436, 440, 305 N.E.2d 400, 403 (1973) (applying the presumption to ownership of a typewriter); *City of Chicago v. Franklin,* 126 Ill.App.2d 43, 48, 261 N.E.2d 506, 510 (1970) (presumption applied to ownership of firearm); *see* 29 Am.Jur.2d Evidence § 235 (1967) ("As a general rule, proof of the possession of personal property is prima facie evidence of title or is said to raise a presump-

tion of ownership. . . .") In the present case, Telesphere came into possession of the 900 number proceeds in the ordinary course of its business. Thus, it is presumed to own those proceeds absent proof of ownership by the IPs.

■ *Second,* Illinois recognizes the common law rule that agents generally do not own property transferred into their possession by or for the benefit of a principal. *Just Pants v. Bank of Ravenswood,* 136 Ill. App.3d 543, 547, 91 Ill.Dec. 49, 53, 483 N.E.2d 331, 335 (1985); *Kessler, Merci and Lochner, Inc. v. Pioneer Bank & Trust Co.,* 101 Ill.App.3d 502, 505–06, 57 Ill.Dec. 58, 61, 428 N.E.2d 608, 611 (1981); *see generally* George G. Bogert & George T. Bogert, *The Law of Trusts and Trustees* § 15, at 162–63 (2d ed. rev. 1984); *Restatement (Second) of Agency* § 14(B) cmts. a, b & c (1958); *Restatement (Second) of Trusts* § 8 cmt. a (1959). Specifically, where money is transferred from a principal to an agent, the agent does not take title to the money. *See Kearney v. Webb,* 278 Ill. 17, 20–21, 115 N.E. 844, 845–46 (1917), in which the Illinois Supreme Court stated that the agent/employees of the owner of a gambling establishment "did not take title" to the money given to them by the owner to conduct a crap game. Thus, as the court held in *Adams v. Adams,* 181 Ill. 210, 212–13, 54 N.E. 958, 959 (1899), proof of an agency relationship overcomes the presumption of ownership by possession. Of course, the burden of establishing an agency relationship is on the party seeking to establish it. *Schmidt v. Shaver,* 196 Ill. 108, 115, 63 N.E. 655, 657 (1902); *Matthews Roofing Co. v. Community Bank & Trust Co.,* 194 Ill. App.3d 200, 206, 141 Ill.Dec. 143, 147, 550 N.E.2d 1189, 1193 (1990) ("The party alleging an agency relationship has the burden of proving it by a preponderance of the evidence.").

---

resort to nonbankruptcy law. Generally, this means resort to state law, both to determine whether property is an asset of the debtor, and so included in the estate, and to determine the nature of the property rights in the assets of the estate.").

4. The IPs and Telesphere have never contested the application of Illinois substantive law. To the contrary, they have assumed its applicability

and have extensively cited to it in their briefs. Accordingly, Illinois provides the applicable nonbankruptcy law here. *Burdett v. Miller,* 957 F.2d 1375, 1382 (7th Cir.1992) (the forum state's substantive law governs a claim arising under state law in the absence of a choice-of-law objection); *Wood v. Mid–Valley, Inc.,* 942 F.2d 425, 426–27 (7th Cir.1991) (same).

■ *The existence of an agency relationship.* In applying this law to the present case, the determinative question is whether Telesphere did in fact receive the 900 number proceeds as an agent of the IPs. In order to establish an agency, control by the principal over the agent is essential—without it no agency exists. *Krug v. Machen,* 24 Ill.App.3d 526, 531–32, 321 N.E.2d 85, 89–90 (1974) ("[T]he distinguishing characteristics of an agency relationship is [sic] the principal's right to control the agent ... and the agent's ability to subject the principal to personal liability and to create new rights in his favor."). *Wonaitis v. Kustak,* 18 Ill. App.3d 17, 19, 309 N.E.2d 300, 303 (1974), applied this rule to a contention that a husband was driving an automobile as his wife's agent. After stating that "[t]he essential elements of agency are ownership and control," the court noted that there was no evidence that the wife had exercised ownership or control over the automobile, and hence affirmed the trial court's decision not to instruct a jury on an agency theory.

■ In the present case, the plaintiff IPs have similarly failed to show that they exercised ownership or control over the 900 number proceeds received by Telesphere from the local telephone companies. To the contrary, Telesphere, without objection from the IPs, exercised complete control over this money:

- Telesphere negotiated, with no input from the IPs, the terms on which it would receive payment from the local telephone companies for 900 number calls.
- Telesphere determined when it would make payment to the IPs; they had no right to payment on demand, but only a right to receive specified amounts on a regular schedule.
- Telesphere determined the extent to which reserves should be established to reflect nonpayment by customers of local telephone companies.
- Telesphere determined whether and how to pursue collection efforts against 900 number customers who failed to make

payments to their local telephone companies.

- Telesphere was able to use funds received from the local telephone companies for whatever purposes it chose; Telesphere did not place 900 number proceeds in a segregated or trust account.

Under Illinois law, the lack of control by the IPs over the 900 number proceeds received by Telesphere negates their claim that Telesphere held these funds as agent of the IPs. This conclusion is consistent with the teaching of numerous bankruptcy decisions that have addressed claims similar to those of the IPs here. For example, *In re Shulman Transportation Enterprises, Inc.,* 744 F.2d 293, 295–96 (2d Cir.1984), dealt with the claim of an airline that the debtor, a freight forwarder, held as the airline's agent the funds it received for freight shipments made through the airline. The court rejected this claim, even though there was an agreement between the airline and the debtor specifying an agency with respect to these funds. Rather, the court looked to the substance of the relationship between the parties, and found a debtor-creditor relationship, based principally on the control that the debtor exercised over the funds: "If there was no contractual duty to remit the proceeds of sale but payment monthly out of [the debtor's] general funds was sufficient, an extension of credit would be established." 744 F.2d at 296, quoting *In re Warner–Quinlan Co.,* 86 F.2d 103, 104 (2d Cir.1936).

Similarly, in *In re Morales Travel Agency,* 667 F.2d 1069, 1071–73 (1st Cir.1981), the court rejected an airline's contention that a debtor travel agent held the proceeds of ticket sales in trust for the airline, *again* despite an agreement between the parties that purported to establish such a trust. The control that the debtor exercised over the ticket proceeds was the principal factor on which the court relied: "Morales [the debtor] was left free to use what it received for its own benefit rather than [the airline's], and to transform the receipts into assets with no apparent encumbrance, upon which potential creditors might rely." 667 F.2d at 1071.[5]

---

5. Several bankruptcy decisions express the concern that assertions of trust or agency may be

made by unsecured creditors to effectively elevate their claims to secured status, without the

The court made it clear that its rejection of the alleged trust would have applied equally had the airline been claiming an agency relationship:

> "[O]ur holding would be the same even were we to find that the relation was intended to be one of principal/agent or consignor/consignee. In either such relationship, a principal or consignor who allows property to appear that of the agent's or consignee's estate will in the event of the latter's bankruptcy be estopped from recovering that property from the trustee. . . ."

667 F.2d at 1073.[6]

*Morales,* in turn, relied on a series of cases dealing with a common fact situation: a seller of goods rents space in a debtor department store, and agrees that the proceeds of the seller's goods would be turned over to the department store, to be paid to the seller on a regular basis, after deducting rental charges. *Carlson, Inc. v. Commercial Discount Corp.,* 382 F.2d 903, 904–06 (10th Cir. 1967); *In re Lord's, Inc.,* 356 F.2d 456, 457–58 (7th Cir.1965), *cert. denied, sub nom. Chicago Cutter–Karcher, Inc. v. Maley,* 385 U.S. 847, 87 S.Ct. 55, 17 L.Ed.2d 78 (1966); *In re Yeager Co.,* 315 F.2d 864 (6th Cir.1963). In each of these cases, a debtor-creditor relationship was found, even where an agreement specified that the sales proceeds were to be held by the department store in trust. Again, the critical factor was the department store's control of the funds. For example, in *Lord's,* the Seventh Circuit found the following facts dispositive:

All sales here were made in the Lessor's name, all proceeds of such sales were immediately turned over to the Lessor with the understanding that they could be commingled with the Lessor's own funds. Not on demand, but on agreed dates, the Lessor paid a net amount (less certain agreed disbursements, returns, etc.) out of the Lessor's own general funds.

356 F.2d at 458.

To support their claim of agency, the plaintiff IPs point to a number of factors, but none of these factors contradict a debtor-creditor relationship. First, the IPs assert their ownership of the proceeds of the 900 number programs because they owned the programs. However, when a sales transaction is managed by a third party, the seller of goods or services does not necessarily own the sales proceeds. In all of the bankruptcy cases listed above, the party claiming an agency or trust relationship had provided the goods or services involved, and had set the price for sale, but this did not give rise to ownership of the sales proceeds in the absence of control over these proceeds.

▮ Second, the IPs point to a letter (apparently intended to be delivered to local telephone companies) that many of them received from Telesphere, purporting to appoint Telesphere as the IP's agent "for matters pertaining to our telephone systems and services provided by your company." (IPRS ¶ 102 [sic: ¶ 103]; IPS April Exhibits, Group Exhibit E (Letter of Agency).) However, the "services" listed in this letter all have to

---

notice to other creditors that a secured claim ordinarily requires. *See In re Auto–Train Corp., Inc.,* 810 F.2d 270, 275 (D.C.Cir.1987):

> The requirements of a constructive trust in this setting may seem formalistic. But it is entirely appropriate to insist on their full rigor, since constructive trust doctrine creates a mechanism by which a creditor may attain a position roughly equivalent to a perfected security interest in proceeds without complying with the usual statutory formalities . . . and thus to undercut the statutory scheme.

*Accord In re Iowa Railroad Co.,* 840 F.2d 535, 545 (7th Cir.), *cert. denied, sub nom. Union Pacific R. Co. v. Moritz,* 488 U.S. 899, 109 S.Ct. 244, 102 L.Ed.2d 233 (1988) (rejecting a claim that interline balances held by a debtor railroad were trust funds, since "[n]othing in the way the [debtor] did business would have alerted other credi-

tors that the funds ostensibly in its control were held in trust."). Indeed, concern for ratable distributions in bankruptcy has led the Sixth Circuit recently to hold that "constructive trusts have no place in bankruptcy," at least where they have not been imposed by a court prior to the bankruptcy filing. *In re Omegas Group, Inc.,* 16 F.3d 1443, 1455 (6th Cir.1994).

**6.** Telesphere's secured creditors have made a formal estoppel argument, asserting that even if Telesphere held the 900 number proceeds as an agent for the IPs, that the IPs are estopped from asserting the agency against these creditors because the creditors relied on the lack of any indication that the IPs owned the funds. However, because no agency exists here, it is not necessary to reach this issue.

do with access to the local telephone customers; billing and collection is not addressed.[7] Thus, although the letter does not exclude the possibility of an agency with respect to funds received from local telephone companies (the letter states that the agency is not limited to the listed matters), neither does it create such an agency by its terms. *See Shulman Transportation Enterprises,* 744 F.2d at 295 (a person may act as an agent in some matters without being an agent as to all dealings with the principal).[8] More importantly, even where there is a document expressly purporting to create an agency or trust with respect to sales proceeds, the courts have not recognized the agency or trust where the actions of the parties are inconsistent with such a relationship. This is the fundamental teaching of *Shulman, Morales, Lord's,* and the other bankruptcy cases cited above. It is also the law in Illinois. *Kilgore v. State Bank of Colusa,* 372 Ill. 578, 580–85, 25 N.E.2d 39, 40–42 (1939) (despite express trust language, debtor-creditor relationship found in light of conduct of the parties regarding payment of sales proceeds).

Third, the IPs argue that Telesphere's failure to segregate funds of the IPs should not be viewed as contradicting their agency theory because segregation would be impractical, citing *In re Penn Central Transportation Co.,* 486 F.2d 519, 524 (3d Cir.1973), *cert. denied, sub nom. Chicago and North Western Transportation Co. v. Baker,* 415 U.S. 990, 94 S.Ct. 1588, 39 L.Ed.2d 886 (1974).[9] Segregation, however, would only be impractical if Telesphere had been required to establish separate accounts for each IP. It would have been entirely practical for Telesphere to have segregated 900 number proceeds, in bulk, from its other revenues, in the same way that attorneys may pool numerous client funds in a single segregated account. *See* Illinois Rule of Professional Conduct 1.15(d) (1990) (nominal or short-term client funds to be deposited in "one or more pooled interest-bearing accounts"). Such a pooled, segregated account would have allowed the IPs control over the 900 number proceeds, consistent with an agency relationship, and given notice to other creditors that a party other than Telesphere had an ownership interest in the funds.

Finally, the IPs assert that they, rather than Telesphere bore the risk of loss for nonpayment, in contrast to *Shulman* and

---

**7.** Illinois law directs courts faced with interpreting a purported contract to consider the entire document rather than particular words or isolated phrases. *La Throp v. Bell Federal Savings & Loan Association,* 68 Ill.2d 375, 381, 12 Ill.Dec. 565, 568, 370 N.E.2d 188, 191 (1977), *cert. denied,* 436 U.S. 925, 98 S.Ct. 2818, 56 L.Ed.2d 768 (1978). Accordingly, the reference in the Letter of Agency to Telesphere's appointment as agent cannot be read in isolation from the immediately following sentence which defines the scope of the agency as including various access services such as "the ordering or rearrangement of services, assignment of primary interexchange carrier, service requests, disconnection of service and requests as indicated below."

**8.** The IPs also point to Telesphere's promotional material stating that it would "handle" billing. However, this material does not describe the manner in which Telesphere would treat the 900 number proceeds it collected from local telephone companies, and hence cannot be seen as describing an agency relationship. Even less relevant are descriptions of Telesphere as "billing agent" found in analyses prepared on behalf of Telesphere's lenders. Whether or not these analyses intended to employ the term agent in its strict legal sense, the opinions in the analyses are hardly binding on this court.

**9.** *Penn Central* dealt with the system of "interline balances" employed in the railroad industry: one carrier would collect the entire charge for shipments on several lines, and the railroads would adjust their balances at the end of each month. 486 F.2d at 523. Prior to the monthly settlement, the funds owing other railroads were kept in the general accounts of the collecting carrier, but thereafter, the other carriers were entitled to "*immediately* draw a draft on the [collecting] railroad for the *net balance* due for the month." *Id.* (emphasis in original). In this fact situation, the court in *Penn Central* found a trust, despite the lack of segregation. *Id.* at 524–25. In *In re Iowa Railroad Co.,* 840 F.2d 535, 544 (7th Cir.), *cert. denied, sub nom. Union Pacific R. Co. v. Moritz,* 488 U.S. 899, 109 S.Ct. 244, 102 L.Ed.2d 233 (1988), the court found the immediate right to payment critical to the *Penn Central* decision and so refused to follow the holding of the *Penn Central* decision in a situation where the creditor railroads did not have the right to immediately draw the interline balances due them. In the present case, the IPs had no right to an immediate draw of the payments due them from Telesphere.

*Morales,* where the purported agent bore the risk of nonpayment. In fact, however, the risk of nonpayment in the present case was shared between the parties. The IPs received payment from Telesphere based on an estimate of the sums that local telephone customers would pay for the IPs' programs, and this estimate was intended to be corrected in subsequent monthly payments. Thus, in theory, the IPs bore the entire risk of nonpayment by the local telephone company's customers. In actuality, however, Telesphere bore some part of this risk. If it overpaid an IP based on an erroneous estimate, and the IP had no subsequent earnings from which Telesphere could deduct the overpayment, Telesphere would be faced with the need to pursue a collection action against the IP. More significantly, Telesphere bore the entire risk of nonpayment by the local telephone companies. If these companies determined to withhold payments respecting 900 number services, Telesphere was nevertheless was obligated to pay the IPs according to its revenue policies. In fact, Telesphere wrote to the IPs prior to the bankruptcy filing, contending that a failure by the local telephone companies to make appropriate payments for 900 number calls was "perpetuating" financial difficulties that "impacted our ability to timely honor our disbursements to you." (IPS April Exhibits, Exhibit Y, Cover Letter.)

The "risk of loss" features of the IP/Telesphere relationship actually serve to point out the absence of an agency relationship regarding the funds Telesphere received from the local telephone companies. Rather than having a fiduciary duty to use these funds at the direction of the IPs, with the IPs bearing the risk of any failure of the telephone companies to make payment, Telesphere had a contractual duty to make monthly payments to the IPs, whether or not it received compensating payments from the telephone companies. Thus, the relationship was one in which Telesphere owed a debt, rather than an agent's fiduciary duty, to the IPs.

■ *Trust law.* Although the IPs do not base their own argument for summary judgment on trust law, they assert that Tele-

sphere should be denied summary judgment because it cannot negate the existence of a trust with respect to the 900 number proceeds. However, the only basis on which the IPs suggest that a trust might be found is constructive trust, an equitable remedy imposed by the courts for wrongdoing. *Suttles v. Vogel,* 126 Ill.2d. 186, 193, 127 Ill.Dec. 819, 822–23, 533 N.E.2d 901, 904–05 (1988):

> A constructive trust is generally imposed in two situations: first, where actual or constructive fraud is considered as equitable grounds for raising the trust and, second, where there is a fiduciary duty and a subsequent breach of that duty.... Some form of wrongdoing is a prerequisite to the imposition of a constructive trust.

No fraud or breach of fiduciary duty appear in this case. The wrongdoing alleged by the IPs is breach of the duties incumbent upon an agent. However, as set forth above, Telesphere and the IPs were not in an agency relationship, but a debtor-creditor relationship, and, as the court stated in *In re Iowa Railroad Co.,* 840 F.2d 535, 545 (7th Cir.), *cert. denied, sub nom. Union Pacific R. Co. v. Moritz,* 488 U.S. 899, 109 S.Ct. 244, 102 L.Ed.2d 233 (1988), "a breach of contracts ... is not enough to create a constructive trust."

Because there is no basis for the imposition of a constructive trust in this case, it is unnecessary to consider the question whether such a trust can be recognized in bankruptcy. *See In re Omegas Group, Inc.,* 16 F.3d 1443 (6th Cir.1994) (constructive trust not recognized).

### Conclusion

For the reasons stated above, the court finds from the facts not in dispute in this case that the 900 number proceeds received by Telesphere from the local telephone companies were not held by Telesphere as an agent or as a trustee of the information providers, but were owned by Telesphere. The court therefore finds that such funds are property of the Telesphere estates and enters judgment accordingly in favor of Telesphere and its lenders and against the plain-

tiff IPs.  A separate judgment order will be entered in conformity with this opinion.