990 F.2d 551
 28 Collier Bankr.Cas.2d 991, Bankr. L. Rep. P 75,220,
21 UCC Rep.Serv.2d 1062
In re CASTLETONS, INC., Debtor.
Mary Ellen SLOAN, Trustee for the Debtor, Castletons, Inc., Appellant,
v.
ZIONS FIRST NATIONAL BANK, Appellee.
 No. 92-4051.
 United States Court of Appeals,
Tenth Circuit.
 April 2, 1993.
 
 Stephen H. Gunn (Keith A. Kelly with him on the briefs) of Ray, Quinney & Nebeker, Salt Lake City, UT, for appellant.
 Jeffrey L. Shields (Gary R. Howe and Paul R. Ince with him on the brief) of Callister, Duncan & Nebeker, Salt Lake City, UT for appellee.
 Before McKAY, Chief Circuit Judge, SETH, Senior Circuit Judge, and MOORE, Circuit Judge.
 JOHN P. MOORE, Circuit Judge.
 
 
 1
 Plaintiff Mary Ellen Sloan, trustee of the bankruptcy estate of Castletons, Inc., appeals the district court's decision affirming dismissal of her bankruptcy court complaint against defendant Zions First National Bank, asserting claims of voidable preference and equitable subordination as well as a state statutory claim for failing to properly return a check. We conclude pre-bankruptcy payments to Zions which arose from floating liens on all the debtor's assets did not constitute preferential transfers. We also affirm the district court's judgment on the remaining claims.I.
 
 
 2
 This appeal arises from a long-standing banking relationship between Zions and the debtor, Castletons, Inc., a former Utah clothing retailer. For several years prior to its bankruptcy, Castletons maintained accounts with and obtained loans from Zions. The loans were secured by Castletons' inventory, accounts receivable, and other personal property in Zions' possession. On January 30, 1986, Castletons renewed and extended its existing line of credit, executing in favor of Zions a $3.6 million line of credit promissory note, Inventory and Accounts Receivable Security Agreement (Security Agreement), and UCC-1 financing statement. The Security Agreement and UCC-1 financing statement created a perfected lien on Castletons' inventory, accounts receivable, contract rights and "personal property now or hereafter" in Zions' possession.[1]
 
 
 3
 By February 25, 1987, Castletons had depleted its line of credit and was unable to obtain additional inventory. Rather than increase the line of credit, Zions entered into a subordination agreement with Maurice L. Rothschild Co. under which Zions subordinated its security interest in Castletons' inventory "and proceeds therefrom" up to $350,000, and Castletons obtained new inventory through secured financing provided by Rothschild.
 
 
 4
 Castletons also closed three of its stores and liquidated a large portion of its inventory, but continued to operate its business solely with proceeds of Zions' collateral generated from the collection of accounts receivable and from the sale of inventory. Because the only new inventory and accounts receivable created during the ninety-day preference period were paid for with proceeds of Zions' collateral, Zions' liens continued upon the new inventory as it was acquired by Castletons.
 
 
 5
 On March 17, 1987, Castletons began depositing income from inventory sales and accounts receivable collections into a "control account" with Zions. From March 17 to May 5, 1987, control account funds were either applied against the outstanding balance due on the line of credit note or deposited in Castletons' general accounts for its use. Through this arrangement, Castletons paid off a "substantial" portion of its $3.6 million line of credit note during the ninety days preceding bankruptcy.[2]
 
 
 6
 Castletons filed a petition for Chapter 11 bankruptcy relief on May 15, 1987. The bankruptcy court terminated debtor's authority to use Zions' cash collateral on June 26, 1987. Zions and Castletons subsequently entered into a court-approved Stipulation and Agreement Concerning Use of Cash Collateral dated July 2, 1987 (Stipulation), whereby Castletons agreed to place itself under the control of a liquidator and Zions conditionally permitted Castletons to use its cash collateral.[3] Under the Stipulation, all proceeds of inventory sales were to be deposited into the control account and supervised by Zions.
 
 
 7
 In September 1988, debtor's case was converted to a Chapter 7 bankruptcy. On October 5, 1989, trustee initiated this adversary proceeding against Zions seeking, among other things,[4] recovery of preferential transfers under 11 U.S.C. § 547(b), equitable subordination of a portion of Zions' claims under 11 U.S.C. § 510(c), and damages arising from Zions' late return of a check drawn on one of debtor's account with Zions. Trustee's claims were dismissed in a series of bankruptcy court rulings before and during trial. On subsequent appeal, the district court affirmed the dismissal. We now review the judgment of the district court. 28 U.S.C. § 158(d).
 
 II.
 
 8
 The Bankruptcy Code provision governing trustee's preference claims, 11 U.S.C. § 547(b), states:
 
 
 9
 Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property--
 
 
 10
 (1) to or for the benefit of a creditor;
 
 
 11
 (2) for or on account of an antecedent debt ...;
 
 
 12
 (3) made while the debtor was insolvent;
 
 
 13
 (4) made--
 
 
 14
 (A) on or within 90 days before the date of the filing of the petition;
 
 
 15
 ....
 
 
 16
 (5) that enables such creditor to receive more than such creditor would receive if--
 
 
 17
 (A) the case were a case under chapter 7 of this title;
 
 
 18
 (B) the transfer had not been made; and
 
 
 19
 (C) such creditor received payment of such debt to the extent provided by the provisions of this title.
 
 
 20
 Within the context of § 547(b), trustee's claims for relief involve two kinds of transfers which occurred during the ninety-day period preceding debtor's Chapter 11 bankruptcy petition: (a) payments of over $1.2 million made by debtor against its line of credit note; and (b) Zions' attachment of liens on new inventory and accounts receivable valued at over $3 million. Trustee contends the district court erred in concluding she failed to meet her burden of proof under 11 U.S.C. § 547(b)(5) for both preference claims. Specifically, she takes issue with the district court's conclusion that "[b]ecause of Zions' preexisting, pre-preference period lien on all accounts receivable, inventory and proceeds, Zions did not receive more from the challenged payments than it would have in a Chapter 7 liquidation." According to trustee, Zions was undersecured ninety days prior to debtor's bankruptcy petition, though the bankruptcy court refused to make such a finding. Moreover, trustee reminds, it is undisputed that Zions received more than $4 million in payments and collateral during the preference period. Trustee maintains the transfers changed the status of the bank "from that of a partially unsecured creditor to that of a fully secured creditor." Porter v. Yukon Nat'l Bank, 866 F.2d 355, 359 (10th Cir.1989). Thus, trustee claims she may recover any transfer to the extent it improved Zions' secured position during the preference period. We review this issue de novo. In re Reliance Equities, Inc., 966 F.2d 1338, 1340 (10th Cir.1992).
 
 
 21
 When assessing an alleged preferential transfer, the relevant inquiry is "not ... what the situation would have been if the debtor's assets had been liquidated and distributed among his creditors at the time the alleged preferential payment was made, but ... the actual effect of the payment as determined when bankruptcy results." Palmer Clay Prods. Co. v. Brown, 297 U.S. 227, 229, 56 S.Ct. 450, 451, 80 L.Ed. 655 (1936) (emphasis added). Indeed, despite trustee's argument to the contrary, the petition date is the relevant date for purposes of the hypothetical creditor test under § 547(b)(5). In re Tenna Corp., 801 F.2d 819, 822 (6th Cir.1986); In re Buyer's Club Mkts., Inc., 123 B.R. 895, 896-97 (Bankr.D.Colo.1991). Moreover, "payments to a fully secured creditor will not be considered preferential because the creditor would not receive more than in a chapter 7 liquidation." 4 Collier on Bankruptcy p 547.08, at 547-43 (Lawrence P. King ed., 15th ed. 1993) (hereinafter 4 Collier ).
 
 
 22
 We think the fallacy of trustee's contentions is self-evident. The focus of § 547(b)(5) is the status of the bankruptcy estate at the time of the filing of the petition. Thus, the only controverted issues in this case are whether the post-filing status of the creditor would have been any different had the transfers not been made and whether the remaining creditors were adversely affected as a consequence of those transfers. 11 U.S.C. § 547(b)(5).
 
 
 23
 The evidence answers the questions in the negative. Zions' post-petition status was unaffected, and the unsecured creditors would not have received more than is now available in the estate if the transfers had not been made. Because debtor's assets were subject to valid security interests on the first day of the preference period, a matter trustee does not contest, and because the collateral was not sufficient to liquidate all the debts owed to Zions on the date of bankruptcy, the bank's post-petition secured claim would have had to absorb all the assets of the estate if the pre-bankruptcy transfers had not been made. Consequently, the fluctuation in value of the collateral during the preference period, which trustee sees as bettering the bank's position, is really irrelevant. This is especially true because all payments to Zions came from assets already subject to its security interest. It is further uncontested that the nature of Zions' security interest in debtor's assets was never altered during the preference period.
 
 
 24
 Under these circumstances, it cannot be said, as § 547(b)(5) requires, the transfers enabled Zions to receive more on its debt than would be available to it in a Chapter 7 distribution. Moreover, because trustee did not establish that the assets subject to the bank's security interest would have fully liquidated its secured claim, she did not satisfy her burden of proof under § 547(b)(5). This conclusion applies with equal force to both of trustee's asserted claims for relief.
 
 
 25
 Nonetheless, trustee contends she established her lien transfer claim because Zions' proceeds lien could not attach until Castletons converted inventory into cash or accounts receivable. To support this argument, she relies on 11 U.S.C. § 547(e)(3), which provides that "a transfer is not made until the debtor has acquired rights in the property transferred." She maintains Zions' only defense lies within the "improvement in position" test, 11 U.S.C. § 547(c)(5), which states:
 
 
 26
 The trustee may not avoid under this section a transfer--
 
 
 27
 ....
 
 
 28
 that creates a perfected security interest in inventory or a receivable or the proceeds of either, except to the extent that the aggregate of all such transfers to the transferee caused a reduction, as of the date of the filing of the petition and to the prejudice of other creditors holding unsecured claims, of any amount by which the debt secured by such security interest exceeded the value of all security interests for such debt ... 90 days before the date of the filing of the petition....
 
 
 29
 The district court adopted the bankruptcy court's finding that the "improvement in position" test was irrelevant to Zions' floating lien because unsecured creditors would not have had a claim to the collateral. According to trustee, the "logical extension" of the court's reasoning is that "a creditor holding a floating security interest in all of a debtor's inventory and accounts receivable could never receive a preference in the form of a floating lien if the security agreement were executed before the beginning of the preference period." As such, the court's reasoning disregards Congress' intent, trustee states, that "such liens [be] set aside to the extent that their attachment during the preference period allows a creditor to improve its position." We cannot agree with these contentions.
 
 
 30
 Trustee's arguments fail to give adequate cognizance to the nature of all the security interests created on Zions' behalf before the preference period. The bank's lien on the proceeds of other secured property might have been inchoate until a sale occurred, but it is uncontestable that a sale of collateralized inventory did not at any time produce unencumbered revenue for Castletons. A sale produced "proceeds," and all proceeds from collateralized assets had been secured prior to the preference period.
 
 
 31
 Of course, trustee correctly notes that when the sale took place, so did a transfer as defined by 11 U.S.C. § 547(e)(3). The question, however, is whether that transfer occasioned a preference. We think the answer must lie within the peculiar facts of this case.
 
 
 32
 This case is distinctive because none of the debtor's assets, and therefore none of the potential assets of the estate, was uncovered at any time during the preference period. All were subject to Zions' floating lien. While the identity of individual items of collateral changed because of sales and subsequent acquisitions of new collateral, the overall nature of Zions' security interest remained the same. Thus, even though trustee is semantically correct when she says Zions acquired "new" collateral during the preference period, the collateral was new only to the extent of its description. In fact, so-called new collateral merely evolved from "old" collateral. Therefore, the extent of Zions' covered position remained the same throughout the preference period.
 
 
 33
 In those evolutionary transactions, the only result was to move Zions' secured interest from one form of collateral to another. So long as the total value of that collateral did not exceed the total amount of its debt, Zions' relationship to hypothetical Chapter 7 unsecured creditors did not change. The aggregate of the transfers that took place within the preference period still did not exceed the total amount of Zions' secured claims on the date of bankruptcy, and there were no unsecured assets which would have been available to pay unsecured creditors. For that reason, we cannot accept trustee's contention that Zions improved its position as a secured creditor during the preference period, thereby subjecting its lien claims to avoidance under 11 U.S.C. § 547(c)(5).
 
 
 34
 Trustee contends the district court misapplied § 547(c)(5) and disregarded "[t]he undisputed evidence ... that Zions received payments of over $1,200,000.00 and new collateral having a value of as much as $4 million during the preference period." However, we believe trustee's emphasis on the amount and value of Zions' collateral is misplaced. "[I]mprovement in position, standing alone, does not establish a preferential transfer--the transfer must be 'to the prejudice of other creditors holding unsecured claims.' " In re Clark Pipe & Supply Co., 893 F.2d 693, 696 n. 3 (5th Cir.1990) (quoting 11 U.S.C. § 547(c)(5)). Thus, it is irrelevant whether Zions improved its position so long as unsecured creditors did not have a claim to Zions' collateral.
 
 
 35
 The purpose of § 547(c)(5) is "to protect the secured creditor against preference actions resulting from mere market fluctuations in the value of debtor's accounts or inventory during the relevant 90-day period." 4 Collier p 547.13, at 547-62. At the same time, however, a creditor may not improve its position at the expense of other creditors. Id. Thus, "if the secured creditor improves its position by acquiring a lien on additional after-acquired inventory or receivables during the 90-day period ... preceding bankruptcy and makes no new advance to match its improved position, then there is a preference to the extent that the security interest increased in value measured by the extent to which unsecured creditors were injured thereby." Id. at 547-60 to 547-61. Here, Zions did not improve its position in relation to unsecured creditors; consequently, we agree with the ultimate conclusion reached by the district court.
 
 III.
 
 36
 Trustee's late check return claim involves a quarterly sales tax check issued to the Utah State Tax Commission and drawn on debtor's general account at Zions. On May 6, 1987, the payee bank presented the check to Zions for payment. Zions opted to dishonor the check, but did not return the check until May 8, 1987, indisputably after the midnight check return deadline imposed by Utah Code Ann. § 70A-4-302(a) (1990).[5] Because trustee's action was filed more than one year but less than three years after the late check return, the issue is whether Utah's one-year "penalty or forfeiture" statute of limitations, Utah Code Ann. § 78-12-29(2) (1992), bars trustee's claim or whether trustee's claim is valid under the three-year non-penalty statute of limitations, Utah Code Ann. § 78-12-26(4) (1992).[6]
 
 
 37
 The bankruptcy court dismissed trustee's late check return claim, finding it barred by the one-year statute of limitations. Upon de novo review, the district court affirmed the dismissal based on Utah case law defining "penalty," public policy, and case law from other states interpreting similar statutes.
 
 
 38
 On appeal, trustee contends the district court erred because the liability imposed by the midnight check return statute is not a "penalty or forfeiture" within the meaning of § 78-12-29(2). Though conceding no reported decision specifically addresses the issue of whether the one-year statute of limitations applies to a late check return claim, trustee cites two Utah federal district court decisions finding the one-year statute inapplicable to an action for treble damages under the Sherman and Clayton Acts. Christensen v. Paramount Pictures, 95 F.Supp. 446, 449-50 (D.Utah 1950); Sinclair Oil Corp. v. Atlantic Richfield Co., 720 F.Supp. 894, 905-06 (D.Utah 1989).[7] Trustee also claims the legislative history of the one-year statute of limitations supports her contention that the provision was intended to apply only to "a penalty statute ... which imposes a fine or a forfeiture--usually in a fixed amount--for violation of a public law."
 
 
 39
 Trustee further challenges the district court's finding that § 70A-4-302 imposes strict liability, citing a number of cases from other jurisdictions in which courts have reduced the payor bank's liability to cover actual damages where the amount of a check exceeded damages suffered. Thus, trustee asserts the proper statute of limitations is Utah's three-year non-penalty statute because " § 70A-4-302 is intended to indemnify a payee who has been damaged by a payor bank's tardy return of a check," not to punish the payor bank for an offense committed against the state.
 
 
 40
 As a preliminary matter, Zions contends de novo review of the district court's decision would be inappropriate because the claim involves an issue of unsettled state law; therefore, we should give deference to the determination of the district court. That option is foreclosed by Salve Regina College v. Russell, 499 U.S. 225, ---- - ----, 111 S.Ct. 1217, 1221-23, 113 L.Ed.2d 190 (1991), in which the Supreme Court expressly rejected the "local court rule" in favor of de novo review. Contrary to Zions' contention, "[t]he obligation of responsible appellate review and the principles of a cooperative judicial federalism ... require that courts of appeals review the state-law determinations of district courts de novo." Id. at ----, 111 S.Ct. at 1225.
 
 
 41
 We start our analysis with the definition that "[a] penalty is a sum of money which the law exacts the payment of by way of punishment for doing some act which is prohibited, or omitting to do some act which is required to be done." State v. Franklin, 63 Utah 442, 226 P. 674, 676 (1924) (citations omitted). We follow this definition because the issue arises under Utah law.
 
 
 42
 Utah's late check return statute is modeled after U.C.C. § 4-302. The Uniform Commercial Code, however, provides no statute of limitations for an action against a bank for wrongful dishonor of a check. Moreover, we have found little other authority on the subject. Because there are no reported Utah cases involving a late check return claim, we must determine which one of the two statutes of limitations at issue is better suited to trustee's claim.
 
 
 43
 In its analysis, the district court in part relied upon the broad definition of "penalty" set forth in Franklin, 226 P. at 676, ultimately concluding the strict liability imposed by Utah's late check return statute was equivalent to a penalty. The court also determined that the one-year penalty statute of limitations "is consistent with the public policy of ... § 70A-4-302 to encourage the prompt settlement of checks."
 
 
 44
 Both parties encourage us to adopt the reasoning of other courts applying statutes of different states. After considering those arguments, we conclude the district court reached the right result. Taking into account the definition of "penalty" provided in Franklin, and the apparent purpose of the law, we think the Utah late check return statute is a penalty statute.
 
 
 45
 Further, we are persuaded the recovery provided by the statute is unrelated to any loss by the drawer or the drawer's bank. Indeed, the recovery provided is limited to the amount of the late check, and the only apparent purpose of the statute is to encourage the prompt settlement of checks in negotiation and to extract a tribute for failure to act in compliance with that purpose. Under those circumstances, the statute does not provide for the recovery of damages and fits more within the Utah definition of a penalty. Thus, the district court correctly held this claim was barred by Utah Ann.Code § 78-12-29(2).
 
 IV.
 
 46
 Trustee maintains the district court erroneously affirmed the bankruptcy court's dismissal of her equitable subordination claim because there was sufficient evidence of Zions' inequitable conduct to justify relief. Her claim is based upon allegations that Zions froze debtor's checking accounts and offset the amount of those accounts against debts owed to Zions. Thereafter, Zions refused to honor debtor's tax check and applied the funds from that check against debtor's loan. Trustee contends Zions' actions establish a "prima facie case" that Zions controlled debtor through the liquidator. Contrary to the district court's conclusion, trustee argues that the Stipulation did not authorize Zions to absorb pre-Stipulation tax funds. Rather, the Stipulation did not address the disposition of such taxes. Moreover, trustee alleges Zions' diversion of sales tax funds damaged the Utah State Tax Commission and decreased the assets potentially available to other unsecured creditors.
 
 
 47
 Trustee also asserts the liquidator was not authorized to refuse payment of sales taxes or to divert such funds to Zions. Thus, trustee contends the district court's failure to distinguish between court approval of the liquidator and the liquidator's subsequent unauthorized actions in effect gives "any creditor who obtains court-approved control over a debtor a blank check to use that control to enrich itself at the expense of other creditors." According to trustee, appointment of a liquidator "should impose a duty of fairness on the appointee ... [and] not bestow an unfair advantage on the party seeking that appointment."
 
 
 48
 In its order approving the Stipulation, the bankruptcy court found Zions had a "valid, properly perfected and enforceable security interest in all of the Debtor's inventory[,] accounts receivable and proceeds therefrom" and that debtor "cannot operate its business without using proceeds from the Collateral." Trustee does not challenge the legitimacy of the Stipulation. Rather, she claims Zions' actions violated the terms of the agreement.
 
 
 49
 The Bankruptcy Code, 11 U.S.C. § 510(c), permits "equitable subordination" of all or a portion of a creditor's claims "for purposes of distribution." A party seeking equitable subordination under § 510(c) must demonstrate:
 
 
 50
 1. The claimant has engaged in inequitable conduct;
 
 
 51
 2. The conduct has injured creditors or given unfair advantage to the claimant; and,
 
 
 52
 3. Subordination of the claim is not inconsistent with the Bankruptcy Code.
 
 
 53
 In re 5000 Skelly Corp., 142 B.R. 442, 446 (Bankr.N.D.Okla.1992) (citations omitted).
 
 
 54
 In Clark Pipe, 893 F.2d at 699, the Fifth Circuit applied the three-part test under circumstances similar to those presented here and determined that although "Associates [the bank] asserted total control over Clark's liquidation, ... we cannot say that the sort of control Associates asserted over Clark's financial affairs rises to the level of unconscionable conduct necessary to justify the application of the doctrine of equitable subordination." Similarly, here the bankruptcy court concluded although Zions "began exercising some influence over the Debtor, significant influence, ... in the early part of the relevant year," Zions "was simply exercising the contract rights that it had, and there's nothing wrong with that." Moreover, "it was not until the Court approved the stipulation for the use of cash collateral and the complete loss of control on the part of the Debtor that the bank really was exercising significant control." Equitable subordination, the court continued, "would be completely improper" because Zions' control over debtor was exercised "pursuant to an order of the Court [which] was properly noticed." The district court concurred, finding Zions' conversion of funds earmarked for payment of debtor's sales taxes authorized by the Stipulation.
 
 
 55
 "The purpose of equitable subordination is to distinguish between the unilateral remedies that a creditor may properly enforce pursuant to its agreements with the debtor and other inequitable conduct such as fraud, misrepresentation, or the exercise of such total control over the debtor as to have essentially replaced its decision-making capacity with that of the lender." Clark Pipe, 893 F.2d at 701. See also In re Bunker Exploration Co., 42 B.R. 297, 301 (Bankr.W.D.Okla.1984). "The critical inquiry ... is whether there has been inequitable conduct on the part of the party whose debt is sought to be subordinated." Long Island Lighting Co. v. Bokum Resources Corp., 40 B.R. 274, 296 (Bankr.D.N.M.1983) (citations omitted). See also In re Raney, 132 B.R. 63, 67 (Bankr.D.Wyo.1991).
 
 
 56
 Though a secured claim may be equitably subordinated, "it is inconceivable that the status of a claim as a secured claim could ever be grounds for justifying equitable subordination." 1993 Bankruptcy Code, Rules & Official Forms (CBC), at 164 (quoting 124 Cong.Rec. H11095, H11113 (daily ed. Sept. 28, 1978)). Moreover, Zions was "under no fiduciary obligation to its debtor or to other creditors of the debtor in the collection of its claim[s]." In re W.T. Grant Co., 699 F.2d 599, 609 (2d Cir.) (quoting In re W.T. Grant Co., 4 B.R. 53, 75 (Bankr.S.D.N.Y.1980) (citations omitted)), cert. denied, 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983). Thus, for trustee's equitable subordination claim to survive Zions' motion to dismiss, she was required to "demonstrate even more egregious conduct ... [such as] 'gross misconduct tantamount to fraud, misrepresentation, overreaching or spoliation.' " In re Dry Wall Supply, Inc., 111 B.R. 933, 938 (D.Colo.1990) (quoting In re Burner, 109 B.R. 216, 228 (Bankr.W.D.Tex.1989) (citations omitted)).
 
 
 57
 The district court concluded Zions took appropriate, justifiable actions to protect its security interest. The court also found trustee failed to show any unfair advantage to Zions or damage to other creditors. These findings cannot be set aside because they are not clearly erroneous. Reliance Equities, 966 F.2d at 1340.
 
 
 58
 The judgment of the district court is AFFIRMED.
 
 
 
 [1]
 On May 30, 1986, debtor executed a second line of credit note, thereby renewing the January 30th note and making the loan due "on demand or if no demand then April 30, 1987." In October and November 1986, debtor executed other notes for new and preexisting loans. Each of these transactions was secured by the Security Agreement
 
 
 [2]
 According to trustee: "As the result of Castletons' payments on Zions' notes and as a further result of the setoffs against Castletons' accounts, Zions was able to reduce the amount of the Castletons' debt from $3,979,127.00 owing on February 14, 1987 (the 90th day prior to the filing of the debtor's petition), to $3,054,234.64 on the date of the petition."
 
 
 [3]
 By August 9, 1990, most of Castletons' inventory had been liquidated and all but $177,115.91 of its loans paid off
 
 
 [4]
 Trustee's original complaint contained 16 causes of action, most of which were dismissed by stipulation or summary judgment
 
 
 [5]
 In relevant part, the midnight deadline statute provides that a payor bank "is accountable for" the amount of a check received "whether properly payable or not if the bank ... does not pay or return the item or send notice of dishonor until after its midnight deadline." Under Utah Code Ann. § 70A-3-506(1) (1990), "[a]cceptance may be deferred without dishonor until the close of the next business day following presentment." Thus, although Zions had a one-day grace period, it still missed the deadline
 
 
 [6]
 Section 78-12-29(2) (1992) imposes a one-year statute of limitations for "[a]n action upon a statute for a penalty or forfeiture where the action is given to an individual, or to an individual and the state, except when the statute imposing it prescribes a different limitation." (emphasis added). In contrast, § 78-12-26(4) (1992) mandates a three-year statute of limitations for "[a]n action for a liability created by the statutes of this state, other than for a penalty or forfeiture under the laws of this state, except where in special cases a different limitation is prescribed by the statutes of this state." (emphasis added)
 
 
 [7]
 Christensen's significance lies in its express statement that "the Utah [one-year penalty] statute of limitations ... refers to actions to enforce the criminal law, in the nature of the well known informers action." Christensen v. Paramount Pictures, 95 F.Supp. 446, 449 (D.Utah 1950) (emphasis added). However, this language is simply dictum because Christensen did not confront the same issue raised in this appeal