In re **TELESPHERE COMMUNICATIONS, INC., Telesphere Network, Inc., and Telesphere Limited, Inc., Debtors.**

**Telesphere Liquidating Trust, Plaintiff,**

v.

**Francesco Galesi, Defendant.**

**Bankruptcy Nos. 91 B 17581, 91 B 19188 and 91 B 19189.**

**Adversary No. 95 A 01051.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Jan. 21, 1999.

Stuart M. Rozen and Kenneth E. Noble, Mayer, Brown & Platt, Chicago, IL, for Francesco Galesi.

Larry M. Wolfson and Jay S. Geller, Jenner & Block, Chicago, IL, for Telesphere Liquidating Trust.

## MEMORANDUM OF OPINION

EUGENE R. WEDOFF, Bankruptcy Judge.

This adversary proceeding, filed by the Telesphere Liquidating Trust ("the Trust"), seeks to recover an alleged preferential transfer from defendant Francesco Galesi. The proceeding is now before the court on a motion for summary judgment brought by Galesi. The principal issue raised by the motion is the proper method of valuing a secured creditor's collateral for purposes of determining whether a payment to that creditor was preferential. As discussed below, when a secured claim is satisfied by an allegedly preferential transfer, the collateral must be valued as of the time of the transfer. For this reason, among others, the motion for summary judgment is denied.

### Jurisdiction

This adversary proceeding "arises under" specific provisions of the Bankruptcy Code (Title 11, U.S.C., the "Code")—the provisions for avoidance and recovery of preferential transfers set out at 11 U.S.C. §§ 547 and 550. Accordingly, the proceeding is within the jurisdiction of the district court pursuant to 28 U.S.C. § 1334(b). *English v. Davis (In re English)*, 59 B.R. 460, 462 (Bankr.N.D.Ga. 1985). The district court may refer such proceedings to bankruptcy judges pursuant to 28 U.S.C. § 157(a), and by General Rule

2.33, the District Court for the Northern District of Illinois has done so. Bankruptcy judges are given the authority to enter appropriate orders and judgments in core proceedings arising in bankruptcy cases pursuant to 28 U.S.C. § 157(b)(1). An action to recover a preference is a core proceeding under 28 U.S.C. § 157(b)(2)(F).

### Findings of Fact

The facts relating to the background of the bankruptcy cases that underlie this adversary have been set forth in prior opinions of this court. See *In re Telesphere Communications, Inc.*, 179 B.R. 544 (Bankr.N.D.Ill. 1994) *("Telesphere Settlement"); Almar Communications, Ltd. v. Telesphere Communications, Inc. (In re Telesphere Communications, Inc.)*, 167 B.R. 495 (Bankr.N.D.Ill. 1994), *rev'd*, 205 B.R. 535 (N.D.Ill.1997); and *In re Telesphere Communications, Inc.*, 148 B.R. 525 (Bankr.N.D.Ill.1992). The background facts relevant to the pending motion for summary judgment, which are undisputed, can be set out briefly here.

On May 31, 1990, Telesphere Communications, Inc. ("Telesphere"), borrowed $26 million from Williams Telecommunications Group, Inc. ("WilTel") and paid the proceeds of the loan to National Telephone Services, Inc. ("NTS"), a company that Telesphere was then planning to acquire. The documentation of the May 31 transaction included two $26 million promissory notes.

One of these notes—the "NTS note"—was issued by NTS (the target corporation) to Telesphere. The NTS note was secured by a stock pledge agreement from NTS's president, Ronald Haan, in which Haan granted Telesphere a security interest in 85% of NTS's outstanding stock and 70% of the outstanding stock of another entity that he controlled, Telic Corporation ("Telic"). The Telic stock, at all relevant times, had sufficient value to secure the NTS note fully.

The other note—the "Wiltel note"—was issued by Telesphere to WilTel. It was secured by the NTS note. Additionally, the Wiltel note was guaranteed by Telesphere's then principal, Francesco Galesi.

Although the two notes were in the same principal amount, their interest and payment terms differed. The WilTel note bore interest at the rate of one percent per month for the first three months, one and one-half percent per month for the following two months, and two percent per month thereafter until the note was paid in full. Interest on the WilTel Note was payable quarterly, but there was no amortization of principal. The principal and unpaid accrued interest was due in full one year from the date of execution, the closing of Telesphere's acquisition of NTS's stock, or the closing of Telesphere's acquisition of the NTS stock covered by the assignment from Haan. In contrast, the NTS note bore interest at the rate of twelve percent per annum, and was payable ·in nineteen quarterly principal installments of $928,-571.43 each, in addition to quarterly interest payments, with all remaining principal and interest due May 1, 1995, and with an accrual of eighteen percent interest per annum on any overdue principal and interest after maturity.

On October 15, 1990, less than five months after the May 31 transaction, Telesphere completed its plan to acquire NTS, obtaining all of its outstanding stock through a leveraged buyout. With all of the assets of both Telesphere and NTS as collateral. Telesphere obtained financing for the buyout from parties not involved in the May 31 transaction. From the proceeds of this financing, Telesphere paid $26.85 million to WilTel to satisfy the Wiltel Note and, accordingly, terminated Galesi's guaranty obligation to WilTel.

What happened to the NTS note as a result of the October 15 transaction is, nominally, disputed by the parties, but there is agreement that, after the transaction, the note was no longer outstanding.[1]

About ten months after the leveraged buyout, on August 19, 1991, an involuntary

---

**1.** Galesi states that "[a]s a result of the WilTel Transfer," the NTS note was "deemed satisfied" and Telesphere's lien (on the NTS and Telic stock) was released. Galesi Statement of Material Facts ¶ 22. The Trust states that, on October 15, NTS's obligations to Telesphere "were 'wiped out' pursuant to a journal entry." Trust Response to Galesi's Statement of Material Facts ¶ 22.

Chapter 7 bankruptcy was filed against Telesphere. On September 11, 1991, Telesphere's involuntary case was converted to a voluntary case under Chapter 11, and two Telesphere subsidiaries, Telesphere Network, Inc. ("TNI") and NTS, also filed voluntary Chapter 11 petitions.

During the administration of the bankruptcy cases, the unsecured creditors' committee negotiated a settlement of potential avoidance actions with the lenders who financed the leveraged buyout and with WilTel. Pursuant to this settlement, which was approved by the court, the estates received claim concessions from WilTel and both claim concessions and cash payments from the lenders. See *Telesphere Settlement,* 179 B.R. 544 (Bankr.N.D.Ill.1994) for a detailed discussion of this settlement. After the settlement was approved, a plan of reorganization was confirmed in which the estates of all three debtors were succeeded by the Trust, which was charged with collecting accounts receivable and pursuing other avoidance actions belonging to the debtors.

The Trust ultimately filed a 25–count amended complaint against Galesi. On July 11, 1997, the court dismissed Counts III through VI and Counts XI through XXV with prejudice. On September 5, 1997, the court dismissed Counts VII through X with prejudice. Galesi currently moves for summary judgment on the only remaining counts, Counts I and II.

In these counts, the Trust seeks to recover the $26.85 million payment of the WilTel note from Galesi pursuant to § 547(b) of the Bankruptcy Code. Both of the counts allege that payment of the note was a transfer of property of an insolvent debtor for Galesi's benefit. Count I alleges that the transferred property belonged to Telesphere; Count II alternatively alleges that the property belonged to TNI.

**Conclusions of Law**

Galesi's motion for summary judgment makes two arguments. The first argument is based on the contention that the WilTel note was fully secured, so that payment of the note could not have been preferential either for WilTel or its guarantor, Galesi. The second argument is that, even if the WilTel note was only partially secured, the Trust has already recovered from the settlement with WilTel an amount exceeding any possible preferential transfer, precluding further recovery pursuant to § 550(d) of the Code, which allows "only a single satisfaction" of an avoided transfer. Neither of these arguments meets the requirements for a grant of summary judgment.[2]

*Valuation of the NTS Note*

In order for a transfer of property of a debtor to be preferential under Section 547(b) of the Code, five separate elements must be established. The transfer in question

(1) must be "to or for the benefit of a creditor,"

(2) must be "for or on account of an antecedent debt,"

(3) must be made while the debtor was insolvent,

(4) must be made within "one year before the date of the [bankruptcy] filing ... if such creditor ... was an insider" and

(5) must enable "such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 ...

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided ... in a Chapter 7 liquidation." 11 U.S.C. § 547(b).

The first four elements of the Trust's preference action are not invoked in the pending summary judgment motion.[3] Rather, Galesi

---

**2.** The standards for an award of summary judgment are set out in one of the earlier decisions in this case, *Almar Communications, Ltd. v. Telesphere Communications, Inc. (In re Telesphere Communications, Inc.),* 167 B.R. 495, 501 (Bankr.N.D.Ill.1994), *rev'd on other grounds,* 205 B.R. 535 (N.D.Ill.1997). Most significantly, summary judgment is only appropriate where "there

is no genuine issue of material fact." Fed. R.Civ.P. 56(c), made applicable to adversary proceedings by Fed.R.Bankr.P. 7056.

**3.** (1) As a guarantor of the WilTel note, Galesi was a "creditor" of Telesphere, because, to the extent that he was required to pay WilTel on his guarantee, he held a contingent claim for subro-

seeks summary judgment on the theory that, because the WilTel note was fully secured, the Trust cannot meet the fifth element—the Chapter 7 liquidation test. This test compares the situation of a creditor after a challenged transfer to the situation that would have existed hypothetically, if the transfer had not occurred, and if the resulting estate were liquidated and distributed in a Chapter 7 case.

In applying the liquidation test to the payment of a secured claim, the courts have established three principles that form the background for the present dispute.

■ First: as Galesi argues, there cannot be preferential payment of a fully secured claim. If there is sufficient collateral to fully secure the creditor's claim—that is, if the collateral would have been liquidated in a Chapter 7 case for at least the amount that the creditor is owed—then the claim would have been paid in full in the Chapter 7 case, and so the creditor would have been in the same situation as the one produced by the prepetition payment. *See Sloan v. Zions First Nat'l Bank (In re Castletons, Inc.)*, 990 F.2d 551, 554 (10th Cir.1993) ("[P]ayments to a fully secured creditor will not be considered preferential because the creditor would not receive more than in a chapter 7 liquidation.") (quoting 4 Collier on Bankruptcy ¶ 547.08, at 547–43 (Lawrence P. King et al. eds., 15th ed.1993)); Michael L. Cook et al., *Preference Litigation*, 767 Practicing L. Inst. /Com. L. & Prac. Course Handbook Series 509, 538 (1998) (collecting cases); David Gray Carlson, *Voidable Preferences and Proceeds: A Reconceptualization*, 71 Am. Bankr.L.J. 517, 532 (1997) ("A fully secured creditor is invited to take as many transfers as the debtor cares to give, even if just prior to the bankruptcy petition.").

■ Second: if a payment is made on debt that is not fully secured, the payment will still be nonpreferential if it only reduces the secured portion of the indebtedness. A partially secured claim is treated, pursuant to § 506(a) of the Code, as though it were two distinct claims: a secured claim to the extent that the value of the collateral supports the claim, and an unsecured claim to the extent of the deficiency in collateral value. Given the treatment of "secured claim" in § 506(a), a payment can only reduce the secured portion of a partially secured claim if it reduces the amount of collateral supporting the claim (since a payment that left the collateral intact would necessarily reduce the unsecured portion of the claim). There are only two ways to reduce the amount of a secured creditor's collateral: to return some or all of the collateral, or to make a payment from unencumbered property in exchange for a release of the lien on an equivalent amount of collateral. In either of these situations, the creditor is simply given what it would have obtained in a Chapter 7 liquidation—the collateral or the value of the collateral—and so, again, there is no preference under the liquidation test. *Schwinn Plan Comm. v. Transamerica Ins. Fin. Corp. (In re Schwinn Bicycle Co.)*, 200 B.R. 980, 988 (Bankr.N.D.Ill.1996) ("[A] creditor that receives payment attributable to a

---

gation against Telesphere, *Levit v. Ingersoll Rand Financial Corp. (In re V.N. Deprizio Constr. Co.)*, 874 F.2d 1186, 1190 (7th Cir.1989) (*"Deprizio"*). In a prior motion, Galesi argued that a "Deprizio waiver" in the WilTel note documentation eliminated his right to subrogation against Telesphere, and hence prevented him from attaining the status of a "creditor" under § 547(b)(1). However, the court determined that such a waiver has no economic impact—if the principal debtor pays the note, the insider guarantor would escape preference liability, but if the principal debtor does not pay the note, the insider could still obtain a claim against the debtor, simply by purchasing the lender's note rather than paying on the guarantee. Thus, the "Deprizio waiver" could only be seen as an effort to eliminate, by contract, a provision of the Bankruptcy Code. The attempted waiver of subordination rights was thus held to be a sham provision, unenforceable as a matter of public policy. Hence, for purposes of § 547(b)(1), Galesi was a "creditor."

(2) The parties have apparently agreed that the payment was made on account of an antecedent debt, the WilTel note, thus satisfying the requirement of § 547(b)(2). However, as noted later in this opinion, part of the payment may more properly be considered to have been made "on account of the creditor's security interest."

(3) The insolvency of Telesphere at the time of the WilTel note payment, proof of which would be required under § 547(b)(3), is acknowledged by the parties to be a matter in genuine dispute.

(4) The payment of the WilTel note on October 15, 1990 took place within one year of the filing of the Telesphere bankruptcy cases in August and September, 1991.

secured claim is not usually 'preferred' because secured creditors generally receive 100% of the value of their collateral upon distribution in a Chapter 7 case.")

■ Third: to the extent that payment of a partially secured debt reduces the unsecured portion of the debt, the payment is preferential (unless all creditors of similar priority are paid in full). Payment of the unsecured portion of an undersecured claim can only be made from assets of the debtor that are not encumbered by the creditor's lien (since, as noted above, if the payment is made from the creditor's collateral, it reduces the secured portion of the claim), and, for the same reason, the payment cannot result in a release of the lien. Such a payment is always preferential in the absence of full payment of all unsecured creditors, because it takes assets that, in a Chapter 7 liquidation, would be distributed pro rata in payment of all unsecured claims (including the unsecured deficiency of the secured creditor) and gives those assets to the secured creditor exclusively. *See* David Gray Carlson. *Voidable Preferences and Proceeds: A Reconceptualization,* 71 Am.Bankr.L.J. 517, 532 (1997) ("[U]ndersecured creditors always fall afoul of [the Chapter 7 liquidation] test—when they receive *unencumbered* dollars from the debtor.")

The impact of these three principles on the prepetition payment of a secured debt was summarized in *Deprizio:*

> A fully-secured creditor will be paid in full under Chapter 7, so there is no avoidable preference ... with or without a guarantee by an insider. If, on the other hand, the security covered only 90% of the debt, then only the remaining 10% of the payment is avoidable as a preference.

*Levit v. Ingersoll Rand Financial Corp. (In re V.N. Deprizio Constr. Co.),* 874 F.2d 1186, 1200 (7th Cir.1989). The parties do not question any of these principles; they acknowledge that the question of whether the WilTel note payment was a preference to Galesi depends on the extent to which the WilTel note was secured by the NTS note. Rather,

the parties dispute the method for determining the secured status of the WilTel note.

■ *The time for valuation of collateral.* To determine whether any particular claim is fully or only partially secured requires measuring (a) the amount of the claim subject to the security interest, and (b) the value of the collateral securing the claim. Both of these items may change between the time of an allegedly preferential transfer and the time of a bankruptcy filing. In the present case, the claim under the WilTel note was $26.85 million on October 15, 1990, when it was actually paid, but if it had not been paid on October 15, 1990, and if there had been no intermediate payments, then, at the time of the bankruptcy filings in August and September of 1991—because of the accruing of interest—the claim under the note would have been substantially greater than $26.85 million. Similarly, if the NTS note had not been canceled in the October 15 leveraged buyout, then, again because of accruing interest, it would have gained substantial value by the time of the bankruptcy filings. Because of the changing values of the claim represented by the WilTel note and the collateral that secured it, there are several possible ways of viewing its secured status.

Galesi reaches the conclusion that the WilTel note was fully secured by (a) fixing the claim under the note at the amount outstanding on the date of the actual payment (October 15, 1990), but (b) measuring the value of the collateral securing the claim (the NTS note) as of the date of the bankruptcy filings (August and September 1991). Under this approach, the WilTel note claim was fully secured, because, by the time of the bankruptcy filings in 1991, the NTS note would have been worth at least as much as the $28.65 million payment actually made on the WilTel note.[4]

To support this approach, Galesi relies principally on decisions stating that the Chapter 7 liquidation test of § 547(b)(5) should be applied to the assets of the debtor's estate as they existed on the date that the debtor's bankruptcy was filed. Although the language of § 547(b)(5) makes clear that

---

4. Due to the differences in their interest and payment terms, the NTS note is alleged by the

Trust to have been worth less than the WilTel note on October 15, 1990.

the hypothetical estate subject to Chapter 7 liquidation and distribution should include the property involved in the allegedly preferential challenge, the statutory language does not state what other property of the debtor should be included in the estate to be liquidated. In filling this lacuna, courts applying the Chapter 7 liquidation test have concluded that the other property should be the estate that was in existence at the time of the actual bankruptcy filing. *Neuger v. United States (In re Tenna Corp.)*, 801 F.2d 819 (6th Cir. 1986) (holding that the estate for liquidation should not be measured *after* the filing date); *Palmer Clay Products Co. v. Brown*, 297 U.S. 227, 56 S.Ct. 450, 80 L.Ed. 655 (1936) (decided under the Bankruptcy Act, holding that the estate for liquidation should not be measured *before* the filing date). *Palmer Clay Products* explained its reasoning in an often-cited dictum:

> Whether a creditor has received a preference is to be determined, not by what the situation would have been if the debtor's assets had been liquidated and distributed among his creditors at the time the alleged preferential payment was made, but by the actual effect of the payment as determined when bankruptcy results.

297 U.S. at 229, 56 S.Ct. at 451.

However, *Tenna Corp.* and *Palmer Clay Products* dealt only with allegedly preferential payments of unsecured claims, and so had no need to consider the treatment of collateral. In fact, there is little support in the case law for the proposition that payment of a secured claim prior to a bankruptcy should be compared, for purposes of the Chapter 7 liquidation test, to the extent of the collateral that would have existed on the date of the bankruptcy filing. *Schwinn Plan Committee v. AFS Cycle & Co. Ltd. (In re Schwinn Bicycle Co.)*, 182 B.R. 514, 523 (Bankr.N.D.Ill.1995) ("*Schwinn I* "), is one of the few cases to hold that "collateral should be valued for purposes of a hypothetical liquidation under § 547(b)(5) as of the date the bankruptcy petition was filed." Although *Schwinn I* cites a number of decisions in support of this proposition, these decisions (including *Tenna* and *Palmer Clay Products* ) involved unsecured claims, and so did

not deal with the time for valuing collateral. More significantly, a later decision in the *Schwinn* bankruptcy concludes that the filing date should *not* be used to determine secured status for purposes of § 547(b)(5). *Schwinn Plan Committee v. Transamerica Ins. Fin. Corp. (In re Schwinn Bicycle Co.)*, 200 B.R. 980 (Bankr.N.D.Ill.1995) ("*Schwinn II* ").

*Schwinn II*, arising out of the same adversary proceeding as *Schwinn I*, dealt with an allegedly preferential payment of a debt secured by unearned insurance premiums. At the time of each challenged payment by the debtor, the value of the unearned premiums was sufficient to fully secure the underlying debt. However, by the time the bankruptcy cases were filed, the value of the unearned premiums would have declined—due to the insurance having been provided—to a level much less than the payments actually made. The plaintiff in the preference action made the same argument that Galesi does in the present case—urging that the actual amounts of the claim payments should be compared to the value of the collateral that would have existed at the time of the bankruptcy filing. The court rejected this approach, instead relying on *In re Prescott*, 805 F.2d 719, 726 (7th Cir.1986), for the following rule:

> If a creditor is fully secured, then it follows that a payment to that creditor merely reduces the secured claim, and releases from the security interest the same amount of collateral. Hence, *if the creditor is fully secured prior to payment*, it cannot be preferenced in having received the payment.

200 B.R. at 991 (emphasis added).

Similarly, in *Travelers Ins. Co. v. Cambridge Meridian Group, Inc. (In re Erin Food Serv., Inc.)*, 980 F.2d 792 (1st Cir. 1992)—a case which, like the present one, involved allegations of preferential transfer in connection with payment of a secured debt guaranteed by an insider—the court emphatically held that the secured status of the claim had to be measured by the value of the collateral at the time of the transfer:

> If the non-insider creditor holds collateral of the debtor sufficient to secure the antecedent debt in full at the time of the transfer, payment on the primary debt

produces no cognizable "benefit" to the guarantor, whether or not an insider, since the insider has no exposure on the debt at the time of the transfer. *Deprizio*, 874 F.2d at 1199–1200; *In re Kroh Bros. Dev. Co.*, 115 B.R. at 1018. Of course the available collateral must be of sufficient value to cover the entire antecedent debt at the time of the transfer. *See In re Gamest, Inc.*, 129 B.R. 179, 182 (Bankr.D.Minn. 1991). Significantly, the test turns on the value of the collateral in existence *at the time of the challenged transfer*, and does not take into account future contingencies which might increase or decrease its value. *Id.* at 801 n. 15.

The holdings of these decisions is a necessary one—the approach suggested by Galesi would produce intolerable results for secured creditors whenever they received payments on debts secured by assets subject to depreciation or depletion. In the common situation of the repossession of an automobile for nonpayment of a purchase money secured debt, the value of the vehicle may decline substantially between the time of the repossession and the time of a bankruptcy filing. If Galesi were correct, the value of the vehicle at the time of transfer—and repossession is a "transfer" under § 101(54) of the Code—would have to be compared to the value the vehicle would have had (without the transfer) at the time of the bankruptcy filing. The entire depreciation of the vehicle from repossession to bankruptcy would then be considered a preference to the secured creditor.[5]

Payments that—at the time they are made—merely return collateral to a secured creditor, or result in a release of collateral to the debtor, do not have a negative impact on unsecured creditors, and hence cannot be considered preferential. In such situations, the debtor merely surrenders property (or its equivalent in value) in which an interest was already conveyed to the secured creditor.[6] Indeed, payments reducing the secured portion of a claim might be considered to have been made "on account of the creditor's security interest," rather than "on account of an antecedent debt," so that such a payment would be nonpreferential under § 547(b)(2), making it unnecessary even to consider the Chapter 7 liquidation test of § 547(b)(5). On the other hand, there is a palpably negative impact on unsecured creditors when unencumbered assets of the debtor are used to reduce the unsecured portion of a secured debt, since in such situations, the debtor's assets could otherwise have been used to pay other unsecured creditors. It is the value of the collateral at the time of payment, not the time of bankruptcy filing, that determines the impact on the estate.

■ *The valuation standard.* Under § 506(a) of the Code, collateral is to be valued "in light of the purpose of the valuation." For purposes of the Chapter 7 liquidation test of § 547(b)(5), the purpose of the valuation is to determine what the secured creditor would obtain in a liquidation of its collateral. Hence, the value should be determined based on the proceeds that the creditor could realize upon a reasonable disposition of the collateral, net of the costs of sale. This is an issue that the parties have not specifically addressed. Galesi has made no assertion regarding the liquidation value of the NTS note as of October 15, the date of the WilTel payment. The Trust has submitted an affidavit stating that, as of October 15, the balance due under the NTS note was about $1.15 million less than the outstanding balance due under the WilTel note (Supplemental Affidavit of Craig T. Elson, filed Aug. 31, 1998, ¶ 15), but the Trust has not indicated whether it believes that this value could have been obtained in liquidation of the note, and

---

**5.** Other difficulties with valuing collateral at the time of filing are described in James J. White & Daniel Israel, *Preference Conundrums,* 98 Com. L.J. I. 11–15 (1993).

**6.** Thus, the Tenth Circuit declined to find a preference when a creditor was given prepetition transfers exclusively from its own collateral. *Sloan v. Zions First Nat'l Bank (In re Castletons, Inc.),* 990 F.2d 551, 554–55 (10th Cir.1993) (not-ing that the question under § 547(b)(5) was "whether the post-filing status of the creditor would have been any different had the transfers not been made and whether the remaining creditors were adversely affected as a consequence of those transfers" and finding that, as to these issues, "the fluctuation in value of the collateral during the preference period ... is really irrelevant").

if so, whether there would have been any costs of disposition. In any event, it is clear that there are questions of fact regarding the liquidation value of the NTS note that preclude any finding that the WilTel note was fully secured at the time of its payment. Hence, Galesi's argument for summary judgment based on the secured status of the WilTel note must be denied.

*The impact of the WilTel settlement.*

Galesi's remaining argument for summary judgment accepts the possibility that the WilTel note may be found partially unsecured, but then argues that any preferential transfer has already been recovered by the Telesphere estates, through their settlement of claims against WilTel.

■ Galesi's first point in this argument is that the Trust's potential recovery on its preference claim is limited. Galesi correctly points out (as indicated in the preceding section of this opinion) that the Trust's recovery cannot exceed the amount by which the WilTel note was undersecured at the time of its payment on October 15, 1990. Although the Trust has not completely addressed the amount of this undersecurity, it appears that the Trust will not be able to recover substantially more than $1.15 million. Galesi next points to this court's finding that the Telesphere estates have received at least $2.4 million from WilTel in the settlement with WilTel and the leveraged buyout lenders. *In re Telesphere Settlement,* 179 B.R. 544, 549 n. 2 (Bankr.N.D.Ill.1994). Finally, Galesi notes that, under § 550(c) of the Code, plaintiffs seeking to avoid a transaction (regardless of whether preference theory or some other ground is asserted) are entitled only to a single satisfaction. *In re H & S Transportation Co.,* 939 F.2d 355, 358 (6th Cir.1991); *Telesphere Settlement,* 179 B.R. at 554. Galesi concludes that the estates, having received more from WilTel than their maximum recovery in the present proceeding, cannot receive any further recovery from him.

■ The difficulty with this argument is in its assumption that the WilTel settlement was subject to the same limits on recovery that apply to the present action. In order to obtain approval of the settlement, the Telesphere estates were only required to demonstrate that the recovery provided by the settlement did not "fall below the lowest point in the range of reasonableness." *In re Energy Co-op., Inc.,* 886 F.2d 921, 929 (7th Cir.1989) (quoting *In re W.T. Grant Co.,* 699 F.2d 599, 608 (2d Cir.), *cert. denied,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983)). This slight burden was even smaller with respect to the provisions of the settlement involving WilTel, because this aspect of the settlement was uncontested. Thus, the Telesphere estates did not exhaustively describe their potential causes of action against WilTel. Although a preference claim was the major ground for recovery asserted by the Telesphere estates, the estates noted and the court considered the possibility of a fraudulent transfer claim. *Telesphere Settlement,* 179 B.R. at 555. The court did not attempt to value this claim in approving the settlement, and its value cannot be specified now.[7] However, it is plain that a fraudulent transfer action would not be limited to seeking recovery of the amount by which the WilTel note was undersecured on October 15, 1990. Rather, the entire $26.85 million transaction was subject to avoidance on this theory.

To the extent that the WilTel settlement was supported by the fraudulent conveyance theory (or any other theory of recovery not addressed at the time of the settlement), the proceeds of the settlement cannot limit the Trust's recovery in this case. Since fraudulent conveyance theory would have allowed recovery of the entire transaction, a settlement that resulted in recovery of less than the entire value of the transaction allows the Trust to seek avoidance on another theory, without obtaining more than a single recovery.

Of course, it may well be that the settlement agreement was premised predominantly (or even exclusively) on a preference re-

---

7. At the time of the settlement approval, the secured status of the WilTel note was never raised, and so the court concluded that the entire payment of the WilTel note might be recovered on a preference theory. *Telesphere Settlement,* 179 B.R. at 554–55. Thus, there was no need to consider what then appeared to be a duplicative fraudulent conveyance claim.

covery. However, the failure of the parties and the court to address this issue at the time of the settlement approval leaves the issue in genuine dispute. Again, then, Galesi's argument for summary judgment fails.

### Conclusion

For the reasons set forth above, the motion of Francesco Galesi for summary judgment as to Counts I and II of the amended complaint is denied. A separate order to that effect will be entered.